For the Polices of the Court, I'm Burt Ketchum here with Pete Bailey on behalf of the appellant. In this case, the appellant brought a vicarious liability claim against the appellee, which is a foster care, foster parenting agency, for the negligence of a foster parent that resulted in the death of an infant. The appellee's position is that the foster parent wasn't its agent, servant, or employee, but an independent contractor of which it had no control. Under West Virginia law... Insufficient control, you mean. Every independent contractor is controlled to some extent. Well, you're talking about the difference between power of control, all right, and the power to retain for safety and procedure. So in other words, law in West Virginia is... I tell my plumber where to run the line. I said, I don't want to go into that wall. I want to go through that wall. Plumber says, oh, okay, then he puts it through that wall. He's still my independent contractor. I don't disagree, Your Honor. Power of control is a determining factor in West Virginia for vicarious liability. You have to cover the manner, means, and details of the work. That's this language. Power of control does not apply to the power retained by governmental entities, general contractors, homeowners, to ensure safety and procedure. In West Virginia, power of control does not apply to that. Now, we're here today because on cross motions for summary judgment, the district court found that while the appellee had control, it wasn't sufficient control. Well, first, sufficient control is not a factor to consider in West Virginia for vicarious liability. But more important, the district court weighed the evidence. The only way he could have found sufficient control is weighing the evidence. And if the court felt there were material issues of fact and dispute, the court should have left it for the jury, but he didn't. Well, I take it that you would agree that what the court should have done is asked whether the evidence would permit a reasonable jury to infer that NECO exercised such control over the false appearance as to establish principal-agent relationship. That would have been the second thing I'd done if I lost my first argument. My first argument would have been judged. Apply the law to the facts. The law in West Virginia is who has power of control. And without belaboring the facts, a memorandum of opinion of order, the court basically went through and recognized that the appellee hired, recruited, trained, and provided continuing education to the foster parent, licensed the foster parent, paid per diem to the foster parent, inspected the home and evaluated the foster parent, had the power to dismiss and discipline the foster parent, and had its own foster parenting agreement that on every aspect that the appellee expected and mandated of that foster parent. Let me ask you about the foster parent agreement because you cite repeatedly to JA 88 to 95, which is the 2013 foster parent agreement. And that's from 2013. So subsequent to that, there were two separate agreements that superseded that. There was one in 2014 and there was one in 2015. What I want to know is why you think you have a basis to rely on a contract that's no longer in place. We ought to be talking about the 2015 contract, right? It's a renewal agreement. That's all that happened in 2015. No. It doesn't say anywhere in there that it's a renewal agreement. It doesn't suggest it's a renewal agreement. It says foster parent agreement. The bottom says it's a revised version. And so they've entered into a subsequent contract and you want to rely on one that was two years old that is no longer enforcing a fact. No, that's not true. If I was going to argue the fact and there are genuine issues of material fact and dispute, I would argue that. That's not the issue here. Here's what we're missing. But answer my question first. Yes. You agree the 2013 contract is invalid and not in place. Well, there's a there's a you're talking about the contract itself or the foster parenting agreement. Foster parent agreement. No, I don't agree. Why is a contract that was entered in 13 where there are subsequent every year there's one entered because according to the deposition testimony, it continued to be applied the same. Once the foster parents signed off, they knew they had these obligations throughout their term, regardless of whether they renewed or not. You might you might suggest that that's a separate argument. My question is, why do you believe that the 2013 agreement itself? You may say that there's some other theory that you can get there. Right. I'm not saying that. I just want to make clear that the 2013 agreement was superseded both by the 2014 agreement and then again by the 2015 agreement, which was the one that was in effect at the time. It's just trying to make sure that we are looking at the right agreement. Well, I see what you're saying. But but if you go to the testimony, that's the way that these foster parents were trained and what they were told that they had to keep following the same guy. I get that. But but just agree with I mean, I'm just trying to make sure I agree with you. OK, I would agree with 15 is the right contract. I think we're missing the issue. OK, well, we understand what the evidence. I'm trying to figure out what the operative contract is. I'm out. I don't think that's weighing the evidence. You're talking about the foster parenting agreement. Yes, that's not the contract. There's a contract where they hire the foster parents and the foster parent has to sign a foster foster parenting agreement, which outlines the duties and obligations that are required of the foster parent. There is a separate contract that's in here that's that's in the brief where they sign on as foster parents. It's only about two pages. Yes. Right. That's a separate one. That's child specific. Right. So the child specific agreement from 2015. Right. And there's a foster parent agreement from 2015. And those are the two applicable contracts. There's a contract and then there's a foster parent agreement. Yes. Those documents. I'll call them documents. Right. The foster parent agreement is not exactly a contract. The foster parent agreement is if you're going to work for us, you're going to follow our guidelines. There's a separate contract to be a foster parent. And that's also from 2015. It's like 2013 and 2015. But two pages. Yes. The 2013 foster parent agreement is superseded by the 2014 and then by the 2015. I would agree. Because I'm not trying to be difficult. I just want to understand what I'm looking at. What we're looking at are the facts and we're not here to argue the facts. If there's any issues. Aren't the contracts facts? That's not. I. If you'll just let me make this simple. No. But you're arguing. You're talking about a relationship. And the question is, is the relationship you argued that the relationship between NECO and the foster parent ship in this case is governed by a contract that lays out in detail. Yes. And the question being raised is what contract. And you're saying, well, that doesn't make any difference because they carry through. No. It does make a difference. What contract is applicable? No. There's a renewal contract or another contract that they had to sign in 2015. I was what I was trying to understand from Judd Richardson is are you talking about the foster parent agreement, which outlines all your duties and obligations? But we're getting away from the argument. I'm most certainly talking about the foster parent agreement. And it's in 2015. And I think you've agreed that that is the operable foster parent agreement. Yes. We're missing the whole thing. We're getting into what the district court did. And the district court did not apply the law to the facts of the case. And the law in West Virginia is power of control is a sole determining factor for vicarious liability. And what evidence in this case gets you there? And you have to look at the contract between the West Virginia DHHR and NECO or NECO, the appellee. And it's in the joint appendix at 6587. And there's one at 734 to 750. And the reason you have to look at that is what the court did, the court said, there's all these facts that the appellant's right and the appellee required of all this is a foster parent. But the court adopted the appellee's argument that West Virginia statute says that the West Virginia Department of Health and Human Resources is charged with foster care. And that the West Virginia Department of Health and Human Resources has several rules, regulations, and guidelines already covering foster care and foster parenting agencies. So the district court said the West Virginia DHHR is in control, but he didn't apply the law to the facts. And what are the facts? You have the contracts I just pointed out between the West Virginia DHHR and NECO, the appellee. And in that contract, the West Virginia DHHR gives NECO the power of foster care and foster parenting services. And in that contract, it's agreed that NECO is an independent contractor and will identify and hold harmless the West Virginia DHHR from civil liability. And that they'll buy a million dollar liability insurance policy for that negligence. That's what happens if you apply the law to the contract. The West Virginia DHHR gave power of control to the appellee over these foster parents. The West Virginia DHHR retained broad general powers of supervision and control, which they retained to ensure safety and procedure. Do you agree that NECO is an independent contractor? Of the West Virginia DHHR? That's how... I'm asking, do you answer the answer? I'm much other stuff as you want to say, but give me the answer. So NECO is, despite the restrictions that the state puts on NECO, you agree that those restrictions don't constitute sufficient control to convert NECO from an independent contractor? No, because the West Virginia DHHR, under that contract, they gave NECO that power of control over the foster parents. But they retained, they also, the state retained control over NECO as well, to some degree. Well, they were training the general broad powers of supervision and control. It's recognized in Schaeffer and in France, which are on page 14 and 15 of the brief. That's law in West Virginia. And that's sufficient to be like that level of control is okay for an independent contractor? Yes. In West Virginia's view, that's a law in West Virginia. That's a law in West Virginia. It's not different from any place else. The distinction between an independent contractor and an employee or master servant is the degree of control as to how far into detail you go. Every single contract has powers of control. I mean, my plumber hypothetical, no one would say the plumber's my employee. He's an independent contractor. He comes up and fixes my pipes. I have a right to fire him. I have a right to put in. I have a right to select the materials. I have a right to tell him where to go. That's a power of my control in hiring him. But he's an independent contractor. So the argument you're making is just too general. I think you're going to have to focus on what we have is whether NECO controls the daily life of the foster parents over the children. And I thought the object of the whole arrangement was to put the foster parents in as close as the children. Working with the children. Telling them when to read to them. The food you're going to give them. They say, oh, sure, it's going to be nutritious. But the parents still make those decisions. And what activities they go out and play and that type of thing. They make those decisions based on the guidelines provided by NECO. Well, sure. Those overarching guidelines, just as a McDonald's franchisee, an independent contractor in every case you've ever read, it has to do the same formula, has to do the same, protect the advertising, the cleanliness. They have pages and pages of regulations. But the actual carrying out of mopping the floor, they have a duty to mop the floor, but they still determine how and when. And somebody slips and falls in McDonald's, they have to sue the McDonald's franchisee. McDonald's is not going to be held responsible. So you're getting into a different independent... I'm talking about the principles of independent contractor and master servant. And the best I could see is the language in West Virginia is like everywhere else, the manner. You have to control the manner, means, and details of the work that's involved. But now you're talking about the relationship between NECO and the foster parent, where Judge Richardson and I, and I thought you and I were talking about the relationship between the West Virginia DHHR and NECO. Yeah, because you were using this generalized term, the power of control. And his point was, in asking that question, is West Virginia has the power of control over NECO. West Virginia does not have the power of control over NECO. Sure, they can fire them, they can terminate it, they regulate it, they put in these requirements, they're detailed requirements. You can always fire an independent contractor. That's my point. So the power of control is too broad a term. So let me go back... And they even do that, they even regulate what NECO has to do and what they have to be guided by and what they have to impose on the foster parents. So my point is, it's not a persuasive argument to argue the power of control. The argument is the degree of control over the work and the relevant work. We're not talking about be a good person or give them nutritious food. And I covered that talking about the contract between the West where NECO admitted in its answer that it's an independent contractor. It was given the power of control over these foster parents to provide foster care by the West Virginia DHHR. The DHHR just retains the broad general powers of supervision and control. Thank you. You finished? Right now. I want to hear a thank you. You and I can go back and forth about independent contractor power. You have to look at the contract between the DHHR and NECO. And your theory is that the contract between the state and NECO means necessarily that the relationship between NECO and the foster parent is not an independent contractor. It's a match. Which relationship again? You're saying the contract between the state and NECO is what dictates our conclusion that the relationship between NECO and the foster parent is one of master-servant? Yes. When you come back, would you answer my question? What is yours? The facts from which a jury can infer that there is a master-servant relationship? Yes. All right. Thank you. Mr. Page. Thank you, Your Honor. May it please the Court, Mr. Ketchum, Mr. Bailey. My name is West Page and I represent the appellee NECO. Judge Niemeyer, I racked my brain for several weeks coming up with a way to concisely describe what foster care is and you were able to do it in about 10 seconds there during the appellant's argument. The goal of foster care in West Virginia is to put foster parents in the most like situation to biological parents that they possibly can. In doing so, the state recognizes that it has to provide certain parameters, certain requirements for foster parents to ensure that in removing a biological child from its natural family and placing them with a foster family, it's not placing them in a worse situation than the one from which it was removed. In preparing for this argument, I was searching for a way to concisely explain what foster care is in West Virginia. The summary I was able to find on the Department of Health and Human Resources website in West Virginia is a 225-page foster care policy document. Now, this is not in the record, but it is a publicly available document of which the Court can take judicial notice. I understand that the Court likely has a pretty good grasp of what foster care is in West Virginia, but I cannot impress upon you the degree of breadth, depth, and complexity inherent in the law, the statutes, the regulations, and NECO's contract with DHHR that prescribe down to the detail what NECO is required to do with respect to its foster parents. So, let me ask this question, just to make sure that we're on the same page. Do you agree that the 2015 foster parent agreement and the 2015 foster care placement agreement, that those are the operative agreements that we're looking at that establish the relationship between NECO and the parents? Yes. Okay. And the 2013 agreement, which is relied upon by the plaintiffs in this case, that that is not operable, having been superseded by the 2014 and then 2015 foster parent agreement? Yes. And Judge Richardson, if you take a look at that agreement and you compare it with the child placing rule under West Virginia Code of State Rule 78-2, I don't know the exact It says, agency foster care agreements with foster parents shall state, and it gives a list. The foster parent agreement lists that language verbatim. So, this isn't some document that NECO came up with on its own to impose its own obligations on the foster parent. It is requiring what the state told it to require. And if you look at the Schaefer versus Acme-Limestone case, that's a West Virginia case. The West Virginia Supreme Court found that simply requiring an independent contractor to do what the state requires of it, or requires of you, is not evidence that you can consider in finding a power of control. So, if I've got a plumber, I've got Judge Niemeyer's plumbers come over to my house now to work for a bit, and I tell him, listen, you got to have workers' comp insurance because the state requires it. You got to do things to like, you got to do it to code. You got to do all the things that the state requires, you know, a builder or a plumber to do. Your position is that type of control, that you must comply with the law, cannot constitute the type of control that transforms an independent contractor into a servant. That's exactly right, because the power of control, the right to control those details of the work, don't rest with you. They rest with the state who's imposed those obligations. Because you, don't have the authority to tell them otherwise. I can't tell the plumber, listen, just don't use the workers' comp. Like, I don't care about code. Like, just get it done as cheaply as possible. That's right. And actually, the converse is true. In the Schaefer v. Acme limestone case, the court allowed the case to proceed against the limestone quarry for negligence of the trucking company because there was evidence that the limestone quarry knew or was allowing or telling the trucking company to overload its trucks beyond the maximum weight limit. Well, that's its own negligence, and that's analogous in this case to NACO's own negligence in selecting and supervising the foster family. The court found no negligence at that level. That's correct. The plaintiff has conceded in not... So the only theory here is now master-servant, whether NACO supervised the work to significant detail so that it was basically the foster parent was the servant of NACO as opposed to an independent contractor. That's absolutely correct. And I want to back up a step, and this is a nuance that I think the case law in West Virginia has missed recently, and I think Judge Copenhaver was understandable in skipping this step, is that before you get to the independent contractor defense, there has to be a prima facie showing of an agency relationship. That's the Sanders v. Georgia Pacific case. And what Sanders says is it's incumbent upon the plaintiff, the party who's seeking to establish vicarious liability, to first establish that there was some sort of agency relationship. Well, they rely on the contracts. But the contracts don't provide that the foster parents are working on behalf of NACO. The statutes are clear that the DHHR retains ultimate decision-making authority over the children. It's DHHR's responsibility to provide care for children who are entrusted into its care for custody or guardianship by a court order removing the child from the family. And so then DHHR contracts with NACO to recruit, train, certify, and support the foster parents. The function of NACO isn't to care for the children. The function of NACO is to assist the state in finding foster parents who will care for the children. So from the outset, the foster parents aren't working on behalf of NACO. They're not out there recruiting other foster parents. They don't support each other. That's the function of NACO's employees. So the foster parents are actually working, to the extent it's working, on behalf of the state and the biological parents to provide the day-to-day care for the children. And while there are comprehensive regulations that establish the conditions under which they can do that, it's up to the foster parents to make day-to-day decisions about what kind of food they're going to feed the children, as long as it's nutritious and varied diet. What kind of activities that they're going to participate in with the children, as long as they're... Where's the requirement that it's nutritious? So like, why do the foster parents, I'm not denying that they should, right, obviously, but like, where do you get that? So that's been an example that's been given. Where do we have to see, where do we look to see that that was a requirement placed by NACO on the foster parents? Well, the original requirement is in West Virginia Code section 49.2.126. That's foster parent or foster children's basic rights. That is imposed through NACO to the foster parents. Where? In the foster parent handbook and in the training they receive under the PRIDE training program, which the state mandated that NACO was to utilize the PRIDE training program for its training of foster parents. And so nothing in the contract requires nutritious food, but we look to the handbook and it's somewhere in the handbook that you got to provide nutritious food. The contracts between DHHR and NACO or NACO and the foster parents? NACO and the foster parents. I mean, the relationship we're looking at, it may be informed by other contracts, but the relationship we're looking at is between NACO and the foster parent. You say there may be not a relationship, but move past that. There's certainly a relationship, not an agency relationship. But that's the relationship we're looking at. And I'm trying to figure, what is the support for the idea that NACO requires, even pursuant to state statute, that the parents provide nutritious food? Well, first off, I think that's an argument that the plaintiff should be making. No, I'm asking you. I get it. It's in the foster parent handbook that talks about what foster parents are to do vis-a-vis the children, and it's inherent in the training. I'm not aware of any specific document that says here are the dietary requirements, but I know that there is training on those requirements provided by NACO to tell the parents how to consider what they're feeding the children. And your argument, as I understand it, is using that as an example, that feeding nutritious food is the equivalent of Judge Niemeyer's not that wall example with the plumber, that that's not control over the manner and means such to convert them to servants. Correct. It's not the details of the work. Assume there was negligence that causes child's death. Who's on the hook? Well, if I may, I'll answer your question, and then I'll back off of that. They could have sued the foster parent. I don't know why they didn't elect to do that. The foster parent was never named as a defendant. The West Virginia Code, or I'm sorry, the CSR provisions, require NACO to purchase additional insurance that covers foster parents for both damage and liability arising out of their work as foster parents. And that, I would submit, is additional evidence that the state of West Virginia doesn't consider foster parents to be agents of NACO. If they did, why would they require NACO to purchase additional insurance for their foster parents? But back to the original point, I think your assumption that there is negligence is a strong one, given the facts of this case. And then that was one of the issues that we argued below, and another ground on which the judgment may be affirmed. And I wasn't planning to hit on any of the other grounds in the record that would support the judgment being affirmed, but there are several. We talked about immunity. We talked about causation. We talked about res ipsa locator. The judgment may be affirmed in whole or in part based on any of those factors. What issues do we have before us? What issues do we have all those issues before us? Are they all briefed? I can't quite recall. They have not been raised as a ground for appeal. Yeah, that's what I'm talking about on appeal. They've not been raised as grounds for appeal because that wasn't the ground on which Judge Copenhaver relied to enter judgment in favor of NACO. But we did incorporate those arguments in our brief. And let me ask you, just as a matter of law, does the master servant require the servant to be a principal agent? Require the agent to do the work of the principal? In other words, in furtherance of the work. Is that recognized in West Virginia law? It is. And Black's Law Dictionary definition of an agent is one who acts on behalf of another in furtherance of the other's interests. And I will come back to that. That's not NACO's role. So your fundamental argument is NACO's business is the placement of children with foster parents, not in being foster parents. Exactly. And there are other companies. And being foster parents. And so they're a placement agency. And the foster care, even though there's a lot of control over the foster parents, their control is to assess the suitability of the placement, not to carry on the business of NACO. NACO's business is the placement. In other words, they don't go solicit on their behalf. They don't make calls. They don't make assessments of others. And they don't review applications and that type of thing. That's precisely correct. NACO, as a child placing agency, that's what it's defined as under West Virginia code, is to recruit, train, certify, and support the foster parents. There are other companies who operate juvenile homes and who actually engage in the day-to-day babysitting role of youth in the Department of Human Resources custody. But maybe that is the core to your whole argument, that it's not so much sufficiency of control, but the activity is not even in furtherance of NACO's business model. That's my first argument, is that the appellant has not even met their prima facie case to establish that. But even if you do consider foster parents acting in furtherance of NACO's interests, you still don't get past the independent contractor defense. NACO does not... I'm getting... My whole question was directed at the independent contractor defense. In other words, we have building arrangements, architects, general contractors, and so forth. Now, an architect controls a lot of what's going on, what the general contractor does, and makes changes and requires things. But the general contractor is not the agent of the architect. The architect's business is to design and carry out. The contractor's business is to implement, carry out the plans the architect designs. NACO is a child placement agency. It's not an overarching supervisory parent of the children. And the parent is hired to supervise the children in a parental relationship or a surrogate. And I gather that's the core of your argument in this case. It is. It doesn't get you then into looking at the regulations because one business highly regulates another business. We have all these cases where contractors, government contractors, have to put in special bolts and everything else in their contractor, but they're still not employees of the government. They're agents, independent contractors. Correct. And I think another good analogy would be a staffing agency. If my firm is in need of legal secretaries, and we call up a staffing agency to go out and recruit secretaries for us, and they provide some training to the secretaries, and then we hire them, the secretary is our employee or our servant. They're working on behalf of us, even though they were recruited and trained by the staffing agency. And I know that's not a perfect example. And that's also true even if the staffing agency is the pass-through organization for payment and the staffing agency maintains some supervision or oversight of that secretary. I would agree. I hope I'm not getting myself in trouble by going down there because I haven't looked at the law with respect to staffing agencies. But at least in this respect, whatever is passed through NECO to the parents is exactly what the state prescribes. If you go to the power of retention and control, or I'm sorry, retention and selection engagement, there are parameters that the state gives NECO that says, here's what you have to get. Here are the people you have to recruit for foster parents. Here are the characteristics that they must have. And so we operate under that. And then once a placement is made, foster parents have to agree to that. They're not just at the whimsy of NECO to accept whoever we throw their way. There's a whole team of people involved in DHHR, involving Child Protective Services, NECO, and the foster parents who make decisions about where the children ultimately placed. You talked about the payment of compensation. Foster parents aren't compensated. They're provided a per diem that's ultimately paid by the state of West Virginia at a rate that the state of West Virginia sets, or at least a minimum rate. And that's not often usually sufficient to cover the expenses that they incur as foster parents. The power of dismissal. Yes, NECO can shut down a foster home at its own discretion. But there's also guidelines from the state of West Virginia that say, under these circumstances, you have to shut down the foster home. And then you get to the power of control. And as we talked about, the day-to-day decisions about how to care for a foster child are left with their foster parents. And based on all that, thank you, Your Honor, Judge Copenhaver correctly decided that NECO is not vicariously liable for the actions of its foster parents. The contrary holding would throw a system that's already in crisis into complete chaos. And for those reasons, we would ask that you affirm. All right. Thank you, Mr. Page. Mr. Ketchum. Please, as a court, it won't throw it in crisis. What they're wanting you to do is create an immunity that doesn't exist and can exist. Because the state gave away power to NECO. And NECO can say, we didn't get paid or they didn't get paid. Master-servant relationship. Recruited, hired, trained. They continue to train. They continue to perform in-home inspections and evaluations of the mother, and it's part of the joint appendix, of the mother and of the household. And this is per diem they talk about. Well, I think this family got $600 a month. And whatever money the foster parent chose not to spend on the child, they pocketed. Liability insurance coverage was paid for. The foster parents that cover the foster parents' negligence was paid for by NECO. The power to dismiss and discipline these foster parents was by NECO. And you want to talk about medical care, nutrition, school. That's on the foster parenting handbook. NECO's foster parenting handbook. NECO taught it. NECO oversaw it. NECO followed up with it with in-home evaluations. Now, there's no dispute under the contract that the state of West Virginia gave power for foster care and foster parenting services to NECO. They gave NECO that power control, which, Judge Niemeyer, I think you disagree with me, but the law in West Virginia is power control is a sole determining factor. I know you disagree with me. No, they use that word in the articulation of the elements. But the power of control is in every contractual relationship, whether it's independent contract or not. It's a question of sufficiency, a degree of control when you play it out with the actual holdings in West Virginia. There are several others that talk about. I don't disagree. Yeah, OK. But let's talk about your plumber. And I think Judge Richardson talked about your plumber and state law with the plumber. I recommended the plumber. Well, he didn't like him. We're going to talk because then council said, well, it's the same way West Virginia DHHR has state rules and regulations. We have to follow. So therefore, we can't be an independent contractor. Well, so what are we going to do with mining companies? Are they no longer liable for their subordinates because of MSHA? Are we going to hold the mining company are carrying on the business of the mining company. The foster parents are not carrying on the business of NECO. Of course, they are. Foster parents are caring for the children that are placed by the NECO. Under that contract, foster care, foster parenting services are the duties and obligation. And that's part of the placement. And they're in the training and the evaluations and the schooling and the nutrition. You can't get around the foster parent agreements. NECO's training, NECO's foster handbooks. The state say, oh, we provide, you know, we get general guidelines for that. So what? That goes back to what I'm talking about MSHA and a mining company. You're not going to look at MSHA just like a trucking broker or trucking company goes hires a driver. Well, they've got to follow the Federal Motor Carrier Safety Act. Well, who they got to sue? This is not complicated. I know you and I disagree, but it's not complicated. It comes down to the state of West Virginia contracted with NECO and gave them power of foster care and foster parenting services. And at this court, and I know foster parent, these foster parenting estates are in jeopardy, but you can't create an immunity when West Virginia, when West Virginia DHHR contracted that power away. And based on that, I would ask this court to reverse or amend back the district court. Thank you, Mr. Ketchum. We'll adjourn court for the day and then come down and recouncil. This Honorable Court stands adjourned until tomorrow morning. God save the United States and this Honorable Court.
judges: Paul V. Niemeyer, Henry F. Floyd, Julius N. Richardson